NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5551-14T3

LEARNING COMMUNITY CHARTER
SCHOOL, SOARING HEIGHTS
CHARTER SCHOOL, ETHICAL
COMMUNITY CHARTER SCHOOL, and
GOLDEN DOOR CHARTER SCHOOL,

 Petitioners-Appellants,

v.

BOARD OF EDUCATION OF THE CITY
OF JERSEY CITY, HUDSON COUNTY,
and NEW JERSEY STATE DEPARTMENT
OF EDUCATION,

 Respondents-Respondents.
_________________________________________________

 Submitted May 2, 2017 – Decided September 14, 2017

 Before Judges Messano, Suter and Grall.

 On appeal from the Commissioner of Education,
 Docket No. 343-11/11.

 Hartmann, Doherty, Rosa, Berman & Bulbulia,
 LLC, attorneys for appellants (Mark A. Berman,
 on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondents Commissioner of
 Education and Department of Education (Melissa
 Dutton Schaffer, Assistant Attorney General,
 of counsel; Geoffrey N. Stark, Deputy Attorney
 General, on the brief).
 Richard E. Shapiro, attorney for respondent
 Board of Education of Jersey City, Hudson
 County.

PER CURIAM

 In a July 6, 2015 final agency decision, the Commissioner of

Education (Commissioner) adopted the initial decision of the

administrative law judge (ALJ), granted motions for summary

decision filed by the Board of Education of the City of Jersey

City (BOE) and the New Jersey Department of Education (DOE), and

dismissed the petition filed by four Jersey City charter schools:

Learning Community Charter School; Soaring Heights Charter School;

The Ethical Community Charter School; and Golden Door Charter

School (collectively, petitioners). Petitioners argue, as they

did before the ALJ and the Commissioner, that the level of funding

the BOE provided to them under the School Funding Reform Act of

2008 (SFRA), N.J.S.A. 18A:7F-43 to -63, was inadequate for their

students to receive a thorough and efficient education as required

by the New Jersey Constitution. N.J. Const. art. VIII, § 4, ¶ 1.

 I.

 We briefly discuss the complex statutory scheme that

controlled the Commissioner's decision and now our review.

 The Charter School Program Act of 1995 (CSPA), N.J.S.A.

18A:36A-1 to -18, authorized the establishment of charter schools

in New Jersey. Charter schools are public schools that operate

 2 A-5551-14T3
under a charter granted by the Commissioner, independently of a

local board of education, and are managed by a board of trustees,

who are "deemed to be public agents authorized by the State Board

of Education to supervise and control the charter school."

N.J.S.A. 18A:36A-3(a).

 The process of applying to the Commissioner for a charter "is

extensive and rigorous." J.D. ex rel. Scipio-Derrick v. Davy, 415

N.J. Super. 375, 380 (App. Div. 2010). The application must

include, among other information, the "financial plan for the

charter school[,]" N.J.S.A. 18A:36A-5(l); N.J.A.C. 6A:11-

2.1(b)(3)(iii)(5), formulated within the "funding parameters

providing for ninety percent per pupil operational funding and no

facilities funding." Davy, supra, 415 N.J. Super. at 380.

 Although funding for charter schools comes from the local

school district, and state and federal aid, it is not equivalent

to per pupil funding that a traditional public school receives.

Under the initial, amended, and current versions of N.J.S.A.

18A:36A-12, charter schools have received 90% of certain funding

categories from the local school district. In addressing this

disparity and upholding the constitutionality of the CSPA, the

Court explained that the Legislature "substantially modified" the

funding provision in the original Senate bill, which had provided

for payment of 100% of the local levy budget per pupil. In re

 3 A-5551-14T3
Grant of Charter Sch. Application in re Englewood on the Palisades

Charter Sch., 164 N.J. 316, 333 (2000). These modifications

address concerns about school districts' ability to pay full per-

pupil cost to charter schools and cover the districts' fixed costs,

which were voiced at public hearings. Id. at 332-33.

 The current version of N.J.S.A. 18A:36A-12 at issue here was

amended by the law that enacted SFRA, which we discuss later, and

provides:

 b. The school district of residence shall pay
 directly to the charter school for each
 student enrolled in the charter school who
 resides in the district an amount equal to 90%
 of the sum of the budget year equalization aid
 per pupil and the prebudget year general fund
 tax levy per pupil inflated by the CPI rate
 most recent to the calculation. In addition,
 the school district of residence shall pay
 directly to the charter school the security
 categorical aid attributable to the student
 and a percentage of the district's special
 education categorical aid equal to the
 percentage of the district's special education
 students enrolled in the charter school and,
 if applicable, 100% of preschool education
 aid. The district of residence shall also pay
 directly to the charter school any federal
 funds attributable to the student.

 [(as emended by L. 2007, c. 206, § 58)].

Notably, there is no requirement that the school district pay the

charter school 90% of per pupil Adjustment Aid — a form of aid

created by SFRA. N.J.S.A. 18A:7F-58.

 4 A-5551-14T3
 Shortly after the Legislature enacted SFRA, the Court

described it as "the State's most recent, lengthy and painstaking

effort to craft a redesigned school funding formula that satisfies

the constitutional standard." Abbott ex rel. Abbott v. Burke, 199

N.J. 140, 147 (2009) (Abbott XX). "SFRA allocates state resources

to school districts, while also requiring certain levels of funding

at the local level." Id. at 152. In upholding the

constitutionality of SFRA's "weighted school funding formula," the

Court found:

 The State has constructed a fair and equitable
 means designed to fund the costs of a thorough
 and efficient education, measured against
 delivery of the CCCS [comprehensive core
 curriculum standards].[] The quality of the
 effort and the good faith exhibited in the
 exercise of discretion over and over again at
 decision-points during SFRA's development
 lead us to conclude that the legislative
 effort deserves deference. The Legislature
 and Executive have made considerable efforts
 to confront the difficult question of how to
 address the education needs of at-risk pupils,
 no matter where those children attend school.
 Those efforts are all the more impressive due
 to the coordinate branches' collective will
 to do so during difficult economic times when
 there is extreme pressure on scarce State
 resources.

 [Id. at 172 (footnote omitted).]

 At the "core" of SFRA's weighted formula is the Adequacy

Budget, which is the spending level necessary to provide public

school students "with the CCCS and extracurricular and co-

 5 A-5551-14T3
curricular activities necessary for a thorough and efficient

education." Id. at 152-53; N.J.S.A. 18A:7F-51. Equalization Aid

is designed to fund any shortfall between a district's Adequacy

Budget and its "local share," or local fair share (LFS). N.J.S.A.

18A:7F-52. As noted, SFRA amended the funding formula for charter

schools, so that a charter school is entitled to "an amount equal

to 90% of the sum of the budget year equalization aid per pupil

and the prebudget year general fund tax levy per pupil inflated

by the CPI rate most recent to the calculation." L. 2007, c. 260

(emphasis added).

 Categorical Aid is a separate funding stream provided to

districts on a per-pupil basis for certain expenses. Abbott XX,

supra, 199 N.J. at 155. It is not based on a district's wealth

or ability to raise funds. Id. at 222 (Appendix-Special Master's

Report). Categorical Aid covers: (1) Special Education and

Extraordinary Special Education Aid, N.J.S.A. 18A:7F-55; (2)

Security Aid, N.J.S.A. 18A-7F-56; (3) Preschool Aid, N.J.S.A.

18A:7F-54; (4) Transportation Aid, N.J.S.A. 18A:7F-57; and various

other aid categories, including School Choice Aid. Id. at 155.

SFRA amended N.J.S.A. 18A:36A-12 to provide that in addition to

90% of the Equalization Aid and the general fund tax levy per

pupil, the district shall pay directly to the charter school,

Security Categorical Aid, Special Education Categorical Aid, and

 6 A-5551-14T3
Preschool Aid if applicable, but not Transportation Aid. N.J.S.A.

18A:36A-12(b).

 Adjustment Aid, which has also sometimes been referred to as

"hold harmless aid," was created to protect districts from a sharp

reduction in state aid as a result of the new formula enacted by

SFRA. Abbott XX, supra, 199 N.J. at 228 (Appendix-Special Master's

Report). As a result, "Adjustment Aid enables districts spending

above adequacy to maintain their current level of spending without

significant tax levy increases or reductions in programs and

services." Ibid. (emphasis added). Adjustment Aid is not

determined on a per pupil calculation or based on the Adequacy

Budget. Id. at 157. There is no provision in either SFRA or CSPA

for charter schools to receive Adjustment Aid.1

 II.

 A.

 In the administrative proceedings, petitioners argued that

because of increased, tax-exempted development, primarily along

Jersey City's Hudson River waterfront, the municipality's general

tax levy was insufficient to provide all public school students,

including those attending petitioners' charter schools, with a

1
 SFRA also provides for Educational Adequacy Aid, N.J.S.A. 18A:7F-
58(b), but neither SFRA nor CSPA provide for this type of aid to
go to charter schools.

 7 A-5551-14T3
thorough and efficient education. They further argued that SFRA

set the formula for calculating the minimum amount of aid that

would ensure all students in New Jersey a thorough and efficient

education, and that particularly in Jersey City, Adjustment Aid

was necessary to bridge any gap occasioned by these reductions in

the general tax levy. Public school students received the benefit

of that adjustment, but charter schools, which received no

Adjustment Aid, did not, leaving petitioners' students receiving

less funding than the State determined was necessary to fund a

thorough and efficient education in Jersey City. Petitioners

argued the Commissioner could and should exercise her discretion

and direct the BOE to pay them an amount equal to 90% of the

Adjustment Aid per pupil.

 In her comprehensive initial decision, the ALJ concluded the

statutory scheme was clear and unambiguous. Charter schools were

not entitled to receive Adjustment Aid, because Adjustment Aid was

not part of the formula designed to fund the costs of a thorough

and efficient education. Rather, it was transitional assistance

designed to enable districts to maintain their existing level of

spending without significant tax levy increases. The ALJ further

reasoned that petitioners' students could attend a traditional

public school in Jersey City that receives Adjustment Aid and,

thus, were not being denied that aid. Lastly, the ALJ found

 8 A-5551-14T3
 petitioners have failed to raise a genuine
 issue that they are unable to provide their
 students a thorough and efficient education
 with the funding available to them. Although
 petitioners submitted affidavits by
 representatives at their respective schools
 addressing the impact of not receiving their
 fair share of the Adjustment Aid, petitioners'
 submissions are bereft of any specific facts
 to support the constitutional claim that the
 education at their schools "fell below
 applicable state regulations, guidelines and
 criteria as required to fulfill the [thorough
 and efficient] obligation."

 [(Quoting Davy, supra, 415 N.J. Super. at
 391).]

 B.

 Petitioners reiterate their arguments before us, contending

Jersey City charter schools are being funded below the minimum

constitutional standards required for all schools, the Legislature

never intended such a consequence in enacting SFRA and petitioner's

students should not be forced to choose between attending a public

school or an underfunded charter school. Having considered these

arguments, we affirm the Commissioner's final decision.

 Appellate review of a final agency decision is limited. In

re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp.,

216 N.J. 370, 374-77 (2013). "An appellate court may reverse an

agency decision if it is arbitrary, capricious, or unreasonable."

Id. at 385. "In other words, a court may intervene when 'it is

clear that the agency action is inconsistent with its mandate.'"

 9 A-5551-14T3
Ibid. (quoting In re Petitions for Rulemaking, 117 N.J. 311, 325

(1989)).

 [T]he judicial role is generally restricted
 to three inquiries: (1) whether the agency's
 action violates express or implied legislative
 policies, that is, did the agency follow the
 law; (2) whether the record contains
 substantial evidence to support the findings
 on which the agency based its action; and (3)
 whether in applying the legislative policies
 to the facts, the agency clearly erred in
 reaching a conclusion that could not
 reasonably have been made on a showing of the
 relevant factors.

 [Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995).]

"However, when an agency's decision is based on the 'agency's

interpretation of a statute or its determination of a strictly

legal issue,'" we are "not bound by the agency's interpretation."

Saccone v. Bd. of Trs. of Police & Firemen's Ret. Sys., 219 N.J.

369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's

Ret. Sys., 206 N.J. 14, 27 (2011)). "Statutory interpretation

involves the examination of legal issues and is, therefore, a

question of law subject to de novo review." Ibid.

 Our role in interpreting the statutes at issue here is to

"determine and give meaning to the Legislature's intent," by first

examining "the plain language of the statute which is typically

the best indicator of intent." In re Plan for Abolition of Council

on Affordable Hous., 214 N.J. 444, 467 (2013). We give words

 10 A-5551-14T3
their "ordinary, generally accepted meaning[,]" but when "the

Legislature uses technical words and phrases that have 'a special

or accepted meaning in the law,' we construe them 'in accordance

with such technical or special and accepted meaning.'" Ibid.

(quoting N.J.S.A. 1:1-1) (citing Marino v. Marino, 200 N.J. 315,

329 (2009)).

 Petitioners argue the statutory framework "envisioned that

charter schools would receive 90% of the funds available to the

district to educate each public school student." However, that

argument ignores the clear and unambiguous language of N.J.S.A.

18A:36A-12(b), which was amended upon passage of SFRA to

specifically incorporate the Legislature's determination regarding

which funding was, and was not, provided to charter schools. We

presume the Legislature was not thoroughly familiar with CSPA, In

re Expungement Petition of J.S., 223 N.J. 54, 75 (2015), and

could have easily added Adjustment Aid to the categories of funding

that a charter school was entitled to receive if it had intended

to do so. N.J. Coal. of Health Care Prof'ls, Inc. v. N.J. Dep't

of Banking & Ins., Div. of Ins., 323 N.J. Super. 207, 256 (App.

Div.), certif. denied, 162 N.J. 485 (1999).

 We also decline petitioners' invitation to declare that the

CSPA, "as applied to Jersey City's charter schools, violates the

Thorough and Efficient Clause of the New Jersey Constitution."

 11 A-5551-14T3
 The New Jersey Constitution provides that "[t]he Legislature

shall provide for the maintenance and support of a thorough and

efficient system of free public schools for the instruction of all

the children in the State between the ages of five and eighteen

years." N.J. Const. art. VIII, § IV, ¶ 1. "[T]he State's

obligation to provide a thorough and efficient system of education

in our public schools is inviolate." In re Grant of Charter Sch.

Application, supra, 164 N.J. at 323. Charter schools are public

schools subject to the "thorough and efficient" education mandate

of the New Jersey Constitution. Davy, supra, 415 N.J. Super. at

392. The Court has already upheld the constitutionality of SFRA's

funding formula. Abbott XX, supra, 199 N.J. at 146.

 Adjustment Aid is not a component of the formulaic base per

pupil amount used to calculate the Adequacy Budget, nor is it

allocated on a per pupil basis. N.J.S.A. 18A:7F-58. Thus,

contrary to petitioners' argument, the fact that CSPA and SFRA do

not provide charter schools with Adjustment Aid, does not, "by

definition" result in funding below the constitutionally mandated

minimum. That is so because the Adequacy Budget — without any

Adjustment Aid — is the spending necessary to provide public school

students with a thorough and efficient education. Abbott XX,

supra, 199 N.J. at 153.

 12 A-5551-14T3
 Adjustment Aid was only "provided as transition assistance

to SFRA's funding methodology." Id. at 157. Adjustment Aid

"enables districts spending above adequacy to maintain their

current level of spending without significant tax levy increases

or reductions in programs and services." Id. at 228 (Appendix-

Special Master's Report) (emphasis added). We reject petitioners'

argument that the statutes are unconstitutional.

 As a variation of this argument, petitioners contend that the

CSPA and SFRA funding formulas, as applied in Jersey City, have

resulted in charter schools receiving less than 90% of the Adequacy

Budget—funding, i.e., below the minimum constitutionally-necessary

per pupil amount, which shortfall has adversely affected their

students. They claim that as a result of the plethora of tax

abatements granted by Jersey City, the school district has used

its Adjustment Aid to subsidize per pupil spending in the

traditional public schools, but has withheld this aid from

petitioners' schools.

 "[A] district with a local levy below its LFS may not be at

adequacy even with full funding of State aid." Abbott v. Burke

(Abbott XXI), 206 N.J. 332, 438 (2011). However, petitioners did

not present any proof as to what amount, if any, Jersey City's

general fund tax levy differs from its LFS as a result of the tax-

abated properties within its border.

 13 A-5551-14T3
 Moreover, we agree with the ALJ's conclusion that petitioners

failed to raise a genuine factual dispute regarding their inability

to provide students with a thorough and efficient education under

the actual funding levels they received. Petitioners have not

cited any statute or regulation they fail to satisfy under their

current funding and have generally acknowledged they are currently

able to satisfy state educational criteria in objective

performance measures. See Abbott by Abbott v. Burke (Abbott IV),

149 N.J. 145, 168 (1997) (CCCS provides necessary content to

deliver the level of education required by the State Constitution).

As a result, we reject the contention that the statutory funding

formula is unconstitutional as applied to Jersey City's charter

schools.

 Lastly, petitioners argue that charter school students should

not be forced to choose between an adequately funded traditional

public school and a constitutionally underfunded charter school.

They claim that the ALJ erred in adopting BOE's and DOE's argument

"it [was] irrelevant that Jersey City's charter schools are being

denied the required minimum level of funding," because "students

can chose to attend adequately funded regular public school."

 Initially, as already noted, petitioners' schools are being

funded under CSPA and SFRA at the constitutionally required level.

More so on point, the ALJ did not find that charter schools could

 14 A-5551-14T3
be underfunded because students had the option to leave and attend

public schools. Rather, in her written decision, she properly

cited to our opinion in Davy for the proposition that "charter

schools are not required to be funded at the same level as

traditional public schools." (Emphasis added).

 In Davy, we performed an equal protection analysis and

concluded, "the charter school program was a reform measure by the

Legislature to ensure that every child receives a thorough and

efficient education by providing an innovative alternative to

traditional public schools. Having enrolled in charter schools,

plaintiffs, unlike traditional public school students, receive an

education largely exempt from regulation." Davy, supra, 415 N.J.

Super. at 392. We noted that if the plaintiffs in that case were

dissatisfied with the education they were receiving at a charter

school, they were free to enroll in a traditional public school.

Id. at 393. "The voluntariness of the program vitiates any

asserted deprivation of a right to receive an education at a school

that is fully funded to the same extent as other Newark public

schools when charter school students have the unabridged option

of attending one of those traditional public schools in their

district." Ibid.

 Writing for our court, Judge Lisa noted it was "significant"

that "under the very strict statutory and regulatory provisions

 15 A-5551-14T3
applicable to charter schools, they are required to provide at

least the level of education, tested by the same standards as

traditional public schools, that is designed to provide a thorough

and efficient education." Ibid. Charter schools failing to meet

that obligation may lose their charter. Ibid.

 In examining the public need for the restriction of scarce

public funds for schools, we found that the "decision to fund the

charter schools at ninety percent and to prohibit them from

receiving state facilities funds was . . . not an arbitrary

decision. It was a legislative compromise in response to the

'worry that charter schools could siphon off public school funds

and eventually undermine public education.'" Id. at 395 (quoting

Patrick Graham, Assembly OKs Charter School Bill, Courier Post

(New Jersey), Jan. 5, 1996, at 4).

 Affirmed.

 16 A-5551-14T3