861 A.2d 867

DEBORAH GREEN AND STEVEN GREEN, PLAINTIFF–
APPELLANTS, v. STATE HEALTH BENEFITS
COMMISSION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 9, 2004—Decided December 9, 2004.

Before Judges COBURN, S.L. REISNER and GRAVES.

*Eugene A. Cross* argued the cause for appellants (*Ramp & Renaud*, attorneys; *Ann L. Renaud*, on the brief).

*Dawn M. Harris*, Deputy Attorney General argued the cause for respondent (*Peter C. Harvey*, Attorney General, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel; *Ms. Harris*, on the brief).

The opinion of the court was delivered by

S.L. REISNER, J.A.D.

Plaintiffs, Deborah Green and Steven Green, appeal a final determination of the State Health Benefits Commission (SHBC) that Mrs. Green's home health aide services are not covered under the Greens' State-provided health benefits plan. We reverse and remand this matter to the SHBC for an administrative hearing.

## I

Steven and Deborah Green (plaintiffs) are members of the State Health Benefits Program (SHBP) through Steven's employer, the Administrative Office of the Courts.[1] Plaintiffs are covered under the SHBP Traditional Plan, which

> is an indemnity plan covering hospital confinements, medical, surgical and diagnostic services. The Commission, through the open public bidding process, has contracted with Horizon Blue Cross/ Shield of New Jersey ... to provide claims

---

[1] Since the Greens were denied an administrative hearing, the record consists of their written submissions to, and responses from, the SHBC and the health plan claims administrator, and the contracts governing the Greens' health plan.

administration services. The Plan must be administered consistent with the contract, including the plan benefit design described in the plan document....

In the fall of 1976, Mrs. Green was diagnosed with multiple sclerosis. As a result of exacerbations of the symptoms of the disease, she required several hospitalizations. Her condition deteriorated over time, and by 1994, she was suffering from depression, physical incapacitation, and was virtually unable to function. In February of 1994, Mr. Green contacted Staffbuilders, a home health care agency, for assistance in getting Mrs. Green to the office of her neurologist, Dr. Michael Margolin. Staffbuilders dispatched Lucille Rizzo, a home health aide, who immediately developed a rapport with Mrs. Green. However, Mrs. Green's symptoms worsened, and Dr. Margolin recommended that she be hospitalized. Mrs. Green was admitted to the hospital for seven days and then released to a rehabilitation center. The Green's Plan paid for both the hospitalization and rehabilitation care.

Upon Mrs. Green's return home from the rehabilitation center, Ms. Rizzo began providing home health care eight hours a day. Additionally, Mrs. Green received skilled nursing care three times a day, for seven days a week. Her condition improved considerably, because the health aide assisted with physical therapy and catheterization as well as more routine care.

Plaintiffs filed a claim with Prudential, then the administrator of the SHBP, for reimbursement for the services provided by Ms. Rizzo and the skilled nurses. The claim was supported by a home health care plan created for the Greens by a social worker, Lori Lazaroff, and Mrs. Green's physician, Dr. Shoemaker.[2] Prudential determined that the home health aide did not qualify as an eligible provider under the Plan, but was considered eligible for coverage on an exception basis through June 16, 1995. The May 16, 1995 letter granting the exception also indicated that the

---

[2] According to Steven Green's certification, the Greens were told by a health advocacy organization that the SHBP would not ordinarily pay for home health aides but would make exception if justified by a comprehensive home health care plan.

Greens could apply for continued coverage under the exception if needed. The Greens did apply, and the Plan paid for the home health care for five years. Since the home health care services have been provided, Mrs. Green has not required any hospitalizations and has been able to live at home despite the debilitating effects of multiple sclerosis.

In September 1999, plaintiffs were informed by Horizon Blue Cross Blue Shield of New Jersey (Horizon), the new claims administrator for the SHBP, that the home health care services would no longer be eligible for benefits under the SHBP Traditional Plan because the services were categorized as "custodial." The letter suggested that Mrs. Green might be better served in a nursing home, the costs of which are not covered by the SHBP. Horizon agreed to pay benefits through October 1999, and the Greens received payments through February 2000.

Through their attorney, plaintiffs attempted to convince Horizon to resume coverage of the home health aide. On February 7, 2001, Dr. Margolin wrote a letter stating that Mrs. Green has thrived in her home environment, asserting that there is no need for institutionalization. On March 31, 2001, the Green's social worker, Lori Lazaroff, issued an evaluation and assessment detailing the beneficial effect that the services of a home health aide have had on Mrs. Green's health and well-being. Specifically, Ms. Lazaroff explained that home health care has enabled Mrs. Green to avoid recurrent hospitalizations. On July 31, 2001, Ms. Lazaroff issued a report recommending that Mrs. Green "stay in her own home and be allowed to function in the community with the assistance of her Home Health Aide."

On November 1, 2002, plaintiffs appealed the denial of benefits and included the evaluations of Dr. Margolin and Lori Lazaroff to support their appeal. On March 12, 2003, Horizon denied the appeal. The denial letter referred to an evaluation performed by Virtua Homecare of West Jersey, which Horizon construed as concluding that "the home health aide is considered custodial/maintenance as there is no skilled need."

On May 29, 2003, plaintiffs filed an appeal with the SHBC and requested an administrative hearing. On June 11, 2003, the SHBC issued an initial administrative decision denying the Greens an administrative hearing and denying their appeal. On July 16, 2003, plaintiffs appealed the initial decision. On December 10, 2003, the SHBC denied the appeal by a Final Administrative Determination, based upon the language in the contract governing the Traditional Plan which excludes custodial care [3] from coverage.

## II

The SHBC was established in the New Jersey Health Benefits Program Act (the Act) in 1961. *N.J.S.A.* 52:14–17.25 to –45. The purpose of the SHBP

> is to provide comprehensive health benefits for eligible public employees and their families at tolerable cost. It establishes a plan for state funding and private administration of a health benefits program which will protect public employees from catastrophic health expenses, and which encourages public employees to rely on the Program instead of seeking protection in the commercial insurance market. [*Heaton v. State Health Benefits Comm'n,* 264 *N.J.Super.* 141, 151, 624 A.2d 69 (App.Div.1993).]

The SHBC contracts with health insurers to provide various benefits plans to program participants. *N.J.S.A.* 52:14–17.28. The Act delegates authority to the SHBC to "establish rules and regulations as may be deemed reasonable and necessary for the administration of this act." *N.J.S.A.* 52:14–17.27. Pursuant to *N.J.A.C.* 17:9–2.14, the SHBC adopted by reference all of the policy provisions contained in the contracts between the health insurance carriers and the SHBC. Further, the Act authorizes SHBC to limit and exclude benefits under the contract "as the [SHBC] finds to be necessary or desirable to avoid inequity, unnecessary utilization, duplication of services or benefits otherwise available . . . or for other reasons." *N.J.S.A.* 52:14–17.29(B).

---

[3] The exclusion for "custodial care," defined as "services that do not require the skill level of a nurse for performance," appears in the State Health Benefits Program Handbook, which is incorporated by reference in the contract.

The Act authorizes the SHBC to contract for provision of services by home health agencies:

(A) The contract or contracts purchased by the commission pursuant to section 4 shall provide separate coverages or policies as follows:

(1) Basic benefits which shall include:

. . . .

(e) *Services rendered by* an extended care facility or by *a home health agency* and for specified medical care visits by a physician during an eligible period of such services, without regard to whether the patient has been hospitalized, *to the extent and subject to the conditions and limitations agreed to by the commission and the carrier or carriers.*

[*N.J.S.A.* 52:14–17.29(A)(1)(e); emphasis added.]

The SHBC has authority to adjudicate disputes between plan members and the carriers concerning health benefit claims under the State plan and may refer such disputes to the Office of Administrative Law (OAL) for an evidentiary hearing. *Burley v. Prudential Ins. Co. of Am.,* 251 *N.J.Super.* 493, 499–500, 598 *A.2d* 936 (App.Div.1991). In this case, Mrs. Green requested an OAL hearing, but the SHBC denied her request. The SHBC concluded that there were no material facts in dispute, and that Green's home health aide services constituted custodial care not covered by the Plan.

### III

We will ordinarily defer to the decision of a State administrative agency unless the appellant establishes that the agency's decision was arbitrary, capricious, or unreasonable, or that it was unsupported by sufficient credible, competent evidence in the record. *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.2d* 712 (1963); *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.2d* 686 (1980). If we conclude that the record supports the agency's decision, we will affirm, even if we might have reached a different conclusion had we considered the matter *de novo. Clowes v. Terminix Int'l Inc.,* 109 *N.J.* 575, 587, 538 *A.2d* 794 (1988). However, it is incumbent on the agency to explain its decision in sufficient detail to assure us that the agency actually considered the evidence and addressed all of the issues before it.

Failure to address critical issues, or to analyze the evidence in light of those issues, renders the agency's decision arbitrary and capricious and is grounds for reversal. *See Authorization for Freshwater Wetlands General Permits, Water Quality Certification and Waiver of Transition Area for Access,* 372 *N.J.Super.* 578, 594–596, 860 *A.*2d 450 (App.Div.2004); *Bailey v. Bd. of Review,* 339 *N.J.Super.* 29, 33, 770 *A.*2d 1216 (App.Div.2001); *Lister v. J.B. Eurell Co.,* 234 *N.J.Super.* 64, 73–74, 560 *A.*2d 89 (App.Div.1989).

In this case, we conclude that the agency decision is arbitrary and capricious, because it fails to address fundamental legal and factual issues. On September 22, 1999, after more than five years of continuously paying for the home health aide, Horizon informed Green that "Services for Home Health Care ... rendered after October 21, 1999 will *no longer be eligible for benefits* under the State Health Benefits Program Traditional plan as these services ... no longer meet the guidelines for coverage [emphasis added]." Implicit in this statement is a conclusion that the services did, at one time in the past, meet the coverage guidelines and were eligible for benefits. The Horizon letter further advised that

> Care Advantage, Inc. (CAI) administers case management services for Horizon Blue Cross Blue Shield of New Jersey (Horizon BCBSNJ). CAI has advised Horizon BCBSNJ that the services currently required by Ms. Green are considered to be custodial in nature. Services are deemed custodial when the nature of the services being rendered are primarily to assist in activities of daily living such as bathing, preparation of meals, assistance in personal hygiene, etc.

The letter suggested a long term care facility as an option, although it would not be covered by the Traditional Plan. The CAI report is not in the record and apparently was never provided to the Greens or their attorney. Likewise, Horizon did not respond to a request from the Greens' attorney for a copy of a doctor's report which apparently formed part of the basis for Horizon's decision to deny coverage.

We have recognized the critical importance of the State Health Benefits Program to State employees and the Program's obligation to deal fairly with employees who rely on its coverage:

> The goal of the State Health Benefits Program Act is to provide comprehensive health benefits for eligible public employees and their families at tolerable cost. It establishes a plan for state funding and private administration of a health benefits program which will protect public employees from catastrophic health expenses, and which encourages public employees to rely on the Program instead of seeking protection in the commercial insurance market.
>
> By undertaking that very consequential role in the financial security of public employees and their families, the State also undertakes to play fair with them.... Because of the significance of health insurance to public employees and their families, and the Legislature's undertaking to furnish insurance and determine its scope, one of the goals of the Legislature must have been to assure the fair and even-handed application of Program provisions, and the avoidance of crabbed interpretations of ambiguous terms.
>
> [*Heaton v. State Health Benefits Comm'n*, 264 *N.J.Super.* 141, 151–52, 624 *A.*2d 69 (App.Div.1993).]

Green contends that her home health care is cost effective, that an exception was permitted to allow payment for that reason, and that there has been no change in circumstances which would lead to any other conclusion than that it is still cost effective for Horizon to pay for this service. Mrs. Green submitted reports from a doctor and a social worker to support her position. Upon a thorough review of the record, we conclude that neither Horizon nor the SHBC has addressed Green's contention. In effect, their decisions have amounted to no more than a bald assertion that "we do not provide coverage for custodial care." Neither Horizon nor SHBC has addressed at all the fact that for five years, the Plan did pay for just such care, under an exception to the usual rule.

The record reflects that the Plan, as administered by Prudential, had a provision that appears to authorize such an exception as part of a comprehensive care plan for a person suffering a catastrophic health condition:

> Catastrophic Case Management Benefits
>
> Catastrophic case management services are available for those Covered Persons with illnesses that usually require a lengthy period of care or complicated patterns of care such as multiple birth defects, strokes, certain types of cancer, etc., to help manage that care.

A patient care coordinator will contact the patient's family to determine whether they want the service or not. If the service is desired, the coordinator will consult with the patient's Doctors and any other Hospital or medical staff treating the patient, to determine the course of treatment needed to provide the patient with the most efficient and cost-effective treatment possible. *If the patient can be treated at home or in a rehabilitation center or hospice with additional therapy or home health care beyond what the Program usually provides, the coordinator can assist in the arrangements and see that the claims are submitted properly.* [State of New Jersey Health Benefits Program at 26, (Replacement Date: July 14, 1993), Exhibit A of Administrative Services Agreement No. 20500, effective January 1, 1990 between Prudential Insurance Company of America and State Health Benefits Commission; emphasis added.]

Green's claim may have been originally approved pursuant to this provision. The May 16, 1995 letter from Prudential indicated that

The file has been reviewed by our Case Management Department. Based upon this review it has been determined that ... the services rendered by the Home Health Aides would be considered eligible on an exception basis through June 16, 1995.

. . . .

If treatment is to continue beyond June 16, 1995 please have the provider of service contact our Case Management Department.

The Horizon Plan has a similar provision:

Voluntary Case Management

The State Health Benefits Program provides voluntary case management services to Traditional Plan members. It is often more cost effective and convenient for a case manager to be involved in the coordination of care for a critically/catastrophically ill member in some situations. This service is purely voluntary. You do not have to take advantage of it.

By utilizing the services of a case manager, your medically appropriate care is coordinated and managed to provide the most cost-effective approach for the completion of long-term care goals.

*For the patient's family, the primary advantage of case management is the additional flexibility and support provided by the case manager. Sometimes it is possible for the patient to be treated at home or in an alternate setting, such as a rehabilitation center or hospice, with additional services or home health assistance.*

[New Jersey State Health Benefits Program, January 2001, at 44–45; emphasis added.]

If Horizon (and its predecessor Prudential) had and still have authority to permit exceptions to the "no custodial care" rule in some circumstances, then it is incumbent upon the SHBC to

explain, in this case, why an exception was permitted in the past and what factual circumstances, if any, have changed so as to make that exception no longer applicable to Mrs. Green's situation. The complete failure to do so renders the agency's decision arbitrary and capricious.

Our conclusion is reinforced by the fact that the original exception was only granted after the Green's submitted an elaborate care plan to Prudential to justify the home health aide. This was not a situation where a claimant slipped an improper claim form past an inattentive claim representative. Steven Green's certification describing the application process, and the letter from Prudential granting the application, supports a reasonable inference that allowing the claim was a carefully considered decision on Prudential's part. Further, the claims were paid for more than five years, suggesting that there was a continuing policy to permit such claims in unusual circumstances. The complete absence of any explanation as to why the claims were paid for five years, coupled with the absence of any substantive discussion of changes in either SHBC policy or in Green's factual circumstances, is troubling. Moreover, the Virtua report, which the SHBC cites in its decision to deny coverage, contains a series of checklists, very little narrative, and no cost-benefit analysis; the report does, however, suggest a conclusion that the reason Mrs. Green does not need more costly, Plan-covered care for services such as catheterization and physical therapy, is that she is receiving such care from her health aide.

Horizon's suggestion that Green should obtain the necessary services in a "long term care" facility (which we take to be a euphemism for a nursing home) suggests an attempt to transform the cost to the Plan for a home health aide into a cost to Medicaid for nursing home care. This may be a fiscally short-sighted choice for the State budget.[4] Further, the record, together with respon-

---

[4] In that connection, we take judicial notice of a recent Executive Order in which the Governor directed the Department of Health and Senior Services to

dent counsel's comments at oral argument, suggests that the Plan might pay for a nurse to perform catheterization, which Green requires three times a day and which is now performed by her home health aide. It might well prove much less expensive to pay for the aide than to pay a nurse to visit Green several times a day to catheterize her. *See Estate of Gettis v. State Health Benefits Comm'n,* 93 *N.J.A.R.*2d 311, 1993 WL 470474 (1993).

While it is not our role to make the kinds of policy choices discussed in the preceding paragraph, it may be the agency's obligation to make them. If the Plan allows Horizon and the SHBC to make a cost-benefit analysis in deciding whether to pay for a home health aide in certain cases of catastrophic illness, then it is Horizon's and SHCB's obligation to make that analysis and not to simply assert peremptorily that they do not pay for this service. This is particularly so when the Plan had been paying for the service for five years, and Mrs. Green had come to rely on it for her well-being.

■ In her original appeal to the SHBC, Green requested an administrative hearing. The agency denied her request, concluding that there were no adjudicative facts to be determined. We disagree. The relative costs and benefits of paying for a home health aide in Green's unique situation present factual questions. Likewise, a hearing would permit the Green's an opportunity to present a further factual basis for her claims of estoppel and quasi-estoppel.[5] Our uneasy sense that the agency has been less

---

financially assist the elderly to obtain home care in lieu of nursing home care. *See Exec. Order No. 100,* (Mar. 23, 2004).

[5] To support an estoppel claim, Mrs. Green would need to establish that she changed her position or otherwise relied to her detriment upon the State's representation that the home health aide was covered under an exception to the Plan. *See Middletown Township Policemen's Benevolent Ass'n Local 124 v. Township of Middletown,* 162 *N.J.* 361, 367, 744 A.2d 649 (2000). Viewed in the light most favorable to Green, *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 A.2d 146 (1995), the record would support an inference that there is a psychological component to Green's condition, that she has grown psychologi-

than forthcoming in providing its records to Green's counsel and in explaining its policies, past and present, supports our conclusion that further proceedings should be supervised by an independent administrative law judge. We conclude that this matter must be remanded to the agency and that it must be transmitted to the Office of Administrative Law for hearing.

Reversed and remanded.

---

cally as well as physically dependent on her caregiver, and that disruption of this arrangement now would result in her relapse into her previous, deplorable physical and mental condition. Indeed, her social worker described the care as an "integral part of her existence." We do not suggest that a factfinder would necessarily conclude, after a hearing, that Green has made a sufficient showing to support her estoppel argument, but only that she should have the opportunity for her day in court.